**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION**

| | |
|---|---|
| **MURRAY ENERGY CORPORATION,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 1:15-cv-00110 (Keeley) |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.* | |
| **Defendants.** | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

In Support of its Motion for Preliminary Injunction, Plaintiff Murray Energy Corporation ("Murray") relies on the following Memorandum of Law.

## INTRODUCTION

Undaunted by their previous failed attempts, Defendants the United States Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers (the "Corps") (collectively, "the Agencies") once again seek to unlawfully annex authority over wholly intrastate waters from the States.  The Agencies recently issued rule, "*Clean Water Rule: Definition of 'Waters of the United States' Under the Clean Water Act,*" 80 Fed. Reg. 37,054 (June 29, 2015) (the "final rule"), represents the Agencies' latest, and most blatant, attempt to improperly expand federal jurisdiction under the Clean Water Act ("CWA"). As with the Agencies' previous attempts, the Agencies' newly broadened definition of "waters of the United States" clearly exceeds the Agencies' authority under the CWA and the U.S. Constitution. Moreover, the final rule is both procedurally and substantively deficient under the Administrative Procedure Act ("APA").

With the final rule's effective date rapidly approaching (August 28, 2015) preliminary relief is necessary to prevent imminent enforcement of this illegal rule. Murray owns and operates five mines located in this judicial district that will be directly affected by the final rule. Absent injunctive relief, Murray will suffer significant—but unrecoverable—financial losses. Murray estimates that the calculable portion of this economic harm will be nearly $14 million. Scott Affidavit at 2-3 (Doc. 3-2).  These staggering sums will be compounded by the accompanying lost productivity and devaluation of Murray's holdings that will be difficult to ascertain. (Compl., ¶ 32).  The costs associated with compliance with this unlawful rule may also lead to employee layoffs.  Scott Declaration at 2 (attached hereto as <u>Exhibit A</u>).

As demonstrated herein, Murray has a substantial likelihood of succeeding on the merits in its challenge of the final rule under the CWA, APA, and the U.S. Constitution.  Further, the final rule will impose immediate and irreparable harm upon Murray, the balance of harms weighs strongly in Murray's favor, and injunctive relief is in the public interest.  For these reasons, the Court should enter an order preventing the Agencies from implementing the final rule to maintain the status quo until the legality of the final rule is determined.

## BACKGROUND

### I.     The CWA And The Agencies' Repeated Attempts To Expand Their Power.

The CWA grants the Agencies regulatory authority over "navigable waters," which are defined as "the waters of the United States[.]"  33 U.S.C. § 1362(7).  Regulatory authority for all other waters is reserved for the States.  *Id.* § 1251(b). The final rule is the Agencies' third attempt to acquire regulatory power over waters properly held by the States.  And, for a third time, the Agencies have acted unlawfully in their attempt to expand jurisdiction under the CWA.

The Agencies' two prior attempts were thwarted by a pair of Supreme Court cases that are controlling as to the issues before this Court.

        a.  *The Supreme Court Rebuffs The Agencies' Attempts To Expand CWA Jurisdiction in* SWANCC *and* Rapanos*.*

In *Solid Waste Agency of Northern Cook County v. United States Army Corp of Engineers* ("*SWANCC*"), the Supreme Court examined the validly of the "Migratory Bird Rule." In essence, this rule allowed the federal government to assert CWA jurisdiction over anything that constitutes a habitat for migratory birds. 531 U.S. 159, 162 (2001). Voicing federalism concerns, the Court found that the agencies' interpretation would "alter[] the federal-state framework by permitting federal encroachment upon a traditional state power." *Id.* at 172-73. The Court further explained that the agencies' interpretation likely pierced the outer limits of the Commerce Clause. Thus, the Court rejected the agencies' bid for administrative deference and avoided passing on "significant constitutional and federalism questions." *Id.* at 174. After refusing to defer to the agencies' interpretation, the Court found the text of the CWA clearly did not apply "to nonnavigable, isolated, intrastate waters" encompassed by the rule. *Id*. at 172.

Unfazed, the Agencies once again sought to greatly expand coverage of the CWA a few years later. This time, in *Rapanos v. United States*, the Supreme Court analyzed the legality of the federal government's attempt to bring a CWA enforcement action against private individuals for discharging fill material into allegedly protected wetlands. 547 U.S. 715, 729 (2006). The Court's majority consisted of a four-Justice plurality opinion and Justice Kennedy's concurring opinion. The plurality concluded that the attempted exercise of CWA jurisdiction was unlawful because a plain reading of the statute "confirm[s] that the waters of the United States' . . . cannot bear the expansive meaning" asserted by the federal government. *Id.* at 731-32. Under the plurality's test, the phrase "navigable waters" could confer jurisdiction only "over relatively

permanent bodies of water." *Id.* at 734. To this end, for an adjacent wetland to be covered by the CWA, a continuous surface connection with the primary water was necessary "making it to difficult to determine where the 'water ends' and the wetland begins." *Id.* at 742.

Finding the plurality's test inconsistent with the CWA, Justice Kennedy concurred in the judgment and wrote separately. 547 U.S. at 776. Justice Kennedy explained that the agencies only have authority over waters that are navigable in fact and waters with a "significant nexus" to navigable waters. *Id.* at 779.[1] To satisfy Justice Kennedy's "significant nexus" test, secondary waters must "significantly affect the chemical, physical, *and* biological integrity of" primary waters. *Id.* at 780 (emphasis added). In Justice Kennedy's view, the agencies are not automatically permitted to assert jurisdiction over all "wetlands (however remote) possessing a surface-water connection with a continuously flowing stream (however small)." *Id.* at 776-77. Hence, the establishment of a "significant nexus" was necessary.

  *b. The Agencies Once Again Attempt to Aggrandize Their Power.*

On April 21, 2014, roughly eight years after *Rapanos*, the Agencies published a proposed rule once again redefining "waters of the United States." 79 Fed. Reg. 22,188 (Apr. 21, 2014). Notwithstanding the clear import of both *SWANCC* and *Rapanos*, the proposed rule declared that expansive new categories of non-primary waters are "waters of the United States." Three of these expansive new categories are germane to the present Motion. First, all "tributaries" (expansively defined) of primary waters were *per se* "waters of the United States." *Id.* at 22,269. Second, all waters "adjacent" to primary waters were *per se* "waters of the United States." *Id.* Third, a catchall category of waters potentially subject to CWA jurisdiction on a case-by-case

---

[1] "The Fourth Circuit has not had occasion to identify the controlling rule of law on the meaning of the term "waters of the United States" that emerged from the *Rapanos* decision." *Deerfield Plantation Phase II-B Prop. Owners Ass'n v. United States Army Corp of Engineers*, 801 F. Supp. 2d 446, 452 (D.S.C. 2011). This uncertainty is of no moment, however, as the final rule fails under both tests.

basis was created to sweep in any waters that were potentially left out of the latter two expansive new categories.  *Id.*  Case-by-case waters were to be considered "waters of the United States" if, "alone, or in combination with other similarly situated waters, including wetlands, located in the same region [they] have a significant nexus to" a primary water. *Id.*  Numerous commentators, including Murray, submitted detailed comments objecting to these new categories.

To the extent that these commentators suspected the proposed rule may not pass muster under *SWANCC* and *Rapanos*, all doubt was removed when the final rule was issued.  On June 29, 2015, the Agencies issued a new, vastly broadened definition of "waters of the United States." 80 Fed. Reg. 37, 054.  As relevant here, the final rule includes several drastic and unforeseeable changes to non-primary waters than those offered in the proposed rule.  Despite waiting nearly a decade to issue the final rule following *Rapanos*, the Agencies hastily set the final rule's effective date for later this month.

Like the proposed rule, the final rule provides that all "adjacent" waters are *per se* jurisdictional.  The final rule does so, however, based on an entirely different conceptual framework than was provided (and commented on) in the proposed rule.  "Adjacent waters" are now defined as waters and wetlands "bordering, contiguous or neighboring" primary waters, even if they are separated from the primary water by man-made or natural barriers.  33 C.F.R. § 328.3(c)(1).[2]  "Neighboring waters" now include: "(1) all waters a part of which is located within 100 feet of the [ordinary high water mark (OHWM)] of a primary water, impoundment, or tributary; (2) all waters any part of which is within the 100-year floodplain, and not more than 1,500 feet from the OHWM, of a primary water, impoundment, or tributary; and (3) all waters any part of which is within 1,500 feet of the high tide line of a primary water." *Id.* § 328.3(c)(2).

---

[2] As described in the preamble to the  final rule, EPA and the Corps made identical changes to the definition of "Waters of the United States" in various regulations.  This Motion generally cites to those changes as reflected in 33 C.F.R. § 328.3.

Significantly, the arbitrary distance and temporal framework instituted by the final rule was not included in the proposed rule. Among other things, this expansive definition sweeps in small ponds, drainages, and wetlands that are connected to navigable waters (if at all) only after once-in-a-century rainstorms. Moreover, numerous wetlands, ponds, and lakes, are now *per se* jurisdictional because they are *partially* within the floodplain or geographic vicinity of a primary water.

In addition, the final rule vastly changed the definition of the "tributaries" of primary waters that are *per se* waters of the United States. 33 C.F.R. § 328.3(a)(5). A tributary is a "water that contributes flow, either directly or through another water" to a primary water and "is characterized by the presence of the physical indicators of a bed and bank and an [OHWM]." *Id.* § 328.3(c)(3). In the final rule, the Agencies declared (for the first time) that "remote sensing sources," or "mapping information" will be used to detect "physical indicators" of a bed and bank. 80 Fed. Reg. at 37,076-78. Remote sensing sources or mapping information will be used to detect these physical indicators, 80 Fed. Reg. at 37,076-78, including searching for the historical presence of a bed and bank and an OHWM where such physical characteristics are "absent in the field." *Id.* at 37,077. So now, "historical presence" of a bed and bank and an OHWM is sufficient to confer federal jurisdiction.

Lastly, the final rule dramatically changed the waters subject to the Agencies' authority on a case-by-case basis. 33 C.F.R. § 328.3(a)(7)-(8). The final rule provides jurisdiction to the Agencies over the following waters, if the Agencies determine that they have a "significant nexus" to a primary water: (1) all waters, any part of which, are within 100-year floodplain of a primary water; and (2) all waters, any part of which are, within 4,000 feet of the high tide line or OHWM of a primary water, impoundment, or tributary. *Id.* § 328.3(a)(8). A water has a

5

"significant nexus" to a primary water if that water, "either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, *or* biological integrity of a [primary water]" based on "any single function or combination of functions performed by the water." *Id.* § 328.3(c)(5) (emphasis added).  Similar to its inclusion in defining "adjacent waters," the addition of an arbitrary distance and temporal framework to the case-by-case analysis could not have been reasonably anticipated based on the proposed rule.

## II.    Procedural Background.

Murray filed its complaint on June 29, 2015.  On July 21, 2015, the Agencies filed a Motion to Stay Proceedings in this matter pending a ruling from the Judicial Panel on Multi-District Litigation to Transfer and Consolidate.  The Agencies' request for a stay to delay proceedings in this matter is incongruent with the fact that they have not exercised their authority to voluntarily "postpone the effective date of [the final rule], pending judicial review."  5 U.S.C. § 705.  Stated differently, the Agencies cannot have it both ways.  Either the Agencies should postpone the effective date of this final rule or this Court should deny the Agencies' Motion to Stay and enjoin the Agencies efforts to move forward with the final rule.   Absent postponement, Murray faces immediate and irreparable harm as a result of the final rule.  Accordingly, Murray requests that this Court grant injunctive relief.

### ARGUMENT AND CITATION OF AUTHORITY

Murray is entitled to a preliminary injunction because (1) there is a substantial likelihood that it will succeed on the merits of the underlying case, (2) Murray will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by Murray in the absence of an injunction would exceed the harm suffered by the Agencies if the injunction is issued, and (4) an injunction is in the public's interest.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

I.      **Murray Is Likely to Succeed on the Merits.**

   A. **The Final Rule Exceeds the Agencies' Authority Under the CWA.**

The final rule exceeds the Agencies' authority under the CWA on numerous fronts.  To begin with, the final rule's expansion of *per se* coverage of "adjacent" waters and "tributaries" is contrary to both the letter and spirit of *SWANCC* and *Rapanos*.  Further, the final rule's category of waters covered on a "case-by-case" represents a jurisdictional expansion that is squarely at odds with both tests articulated in *Rapanos*.  While these are not the only violations of the CWA, they are the most obvious.  And, as is relevant at this stage in litigation, these facially invalid provisions make clear that Murray has a substantial likelihood of prevailing on the merits.

   a. *Per Se Coverage Of All Adjacent Waters.*

The final rule improperly asserts *per se* coverage of "adjacent" waters.  This expansion fails under both *Rapanos* tests.  First, it is contrary to the *Rapanos* plurality test because it purports to include *per se* coverage over all "adjacent" waters, sweeping in any water "adjacent to" or "neighboring" tributaries or impoundments, even when there is no "continuous surface connection" to a traditional "water of the United States."  *Rapanos*, 547 U.S. at 742 (plurality opinion).  Similarly, the "adjacent" water expansion improperly sweeps in any water and land within the 100-year flood plain, even when there is no "continuous surface connection" to a primary water. *Id.*  This *per se* coverage, therefore, fails under the *Rapanos* plurality test.

The final rule's *per se* coverage of "adjacent" water fares no better under Justice Kennedy's test.  Initially, the Agencies' claim that all waters covered by the "adjacent waters" definition have a "significant nexus" with interstate, navigable waters is a farce.  It is beyond cavil that the Agencies' claim of automatic authority to regulate any drainage, small pond, or wetland that might have a relationship with a primary water *every hundred years* does not

comport with Justice Kennedy's approach in *Rapanos*.  This test requires a greater degree of "assurance" that a water "significantly affect[s]" the "chemical, physical, and biological integrity," of a primary water than the attenuated contact "adjacent" waters may have on a primary water under the final rule.  547 U.S. at 780-81.  As such, the final rule is contrary to the limits provided in Justice Kennedy's concurring opinion because it sweeps in "adjacent," "neighboring," waters even where there is no "significant nexus" to traditional "waters of the United States."  40 C.F.R. § 230.3(o)(3)(i); *Rapanos*, 547 U.S. at 780.

> b.  *Per Se Coverage Of Tributaries.*

The final rule also improperly asserts *per se* coverage of "tributaries."  Under the final rule, a tributary is "characterized by the presence of physical indicators of a bed and banks and an [OHWM]" and contributes flow . . . either directly or through another water" to a primary water.  33 C.F.R. § 328.3(c)(3).   As stated, this broad definition encompasses wholly intrastate and isolated ponds, ephermal streams, and channels that are dry for most of the year as long as there is a discernible high water mark.  The definition of a "tributary" violates *Rapanos*' plurality test because it includes any feature with any flow into traditional waters, even when there is no "continuous surface connection."  *See Rapanos*, 547 U.S. at 742.  The *per se* inclusion also fails under Justice Kennedy's test because it regulates all tributaries even where there is no impact on the "chemical, physical, and biological integrity of" a primary water.  *Id.* at 780-81.

> c.  *Case-By-Case Coverage*

The final rule's creation of a category of waters covered on a case-by-case basis also fails under *Rapanos*.   Under the final rule, the Agencies can assert jurisdiction over any waters within the 100-year floodplain of a primary water and also any waters within 4,000 feet of the high tide line of a primary water, impoundment, or tributary.  33 C.F.R. § 328.3(a)(8).  The number of

waters the final rule now considers *per se* regulated (adjacent, neighboring, and tributary) means that expansive areas of land located within the 100-year floodplains or within 4,000 feet of these primary waters.  Tellingly, the EPA acknowledges that "the agencies have determined that the *vast majority* of the nation's water features are located within 4,000 feet of a covered tributary, traditional navigable water, interstate water, or territorial sea." *See* Economic Analysis of the EPA-Army Clean Water Rule, (May 2015) (emphasis added).  Unsatisfied with their regulatory annexation of the "vast majority" of the nation's water features, the case-by-case coverage even includes a bootstrapping provision.  Namely, even if only a small fraction of a water feature falls within these geographic areas (and it is determined to have a significant nexus) the entire feature is regulated.  80 Fed. Reg. 37,117.

Pursuant to this case-by-case analysis, an intrastate water can be subject to a "significant nexus" test (and thereafter be regulated by the Agencies) simply because it has a geographic proximity to a *non-navigable* interstate water.   Clearly, this approach is contrary to the *Rapanos* plurality's statement that a "water of the United States" must have some connection to "a relatively permanent body of water connected to traditional interstate *navigable waters*." *Rapanos*, 547 U.S. at 742 (plurality opinion) (emphasis added).

The final rule's approach to "significant nexus" determinations is equally violative of Justice Kennedy's test in *Rapanos*, as well as the Court's opinion in *SWANCC*.   Once again, under Justice Kennedy's approach, federal jurisdiction over an intrastate water is permissible only where that water "significantly, affect[s]" the "chemical, physical, *and* biological integrity" of a primary water. *Id.* at 780 (emphasis added). Yet, the final rule only requires a finding of impact on "chemical, physical, *or* biological integrity" of a primary water. 33 C.F.R. § 328.3(c)(5) (emphasis added). Thus, the final rule asserts that a significant "biological effect"

9

including an effect on "life cycle dependent aquatic habitat[s]," standing alone, would place a water within the CWA's jurisdiction. *Id.*[3]  Because the final rule impermissibly includes these case-by-case waters as "waters of the United States," Murray will succeed in its CWA challenge.

## B. The Agencies Adopted the Final Rule in Violation of the APA.

The APA's rulemaking requirements contain both procedural and substantive components. Procedurally, the APA requires that an agency's final rule be the "logical outgrowth" of the proposed rule to ensure that the public is given an adequate opportunity to comment. *Manufactured Hous. Inst. v. United States EPA*, 467 F.3d 391, 400 (4th Cir. 2006). Notwithstanding the fact that the court's "review of any agency's final decision is relatively narrow," the court "must be strict in reviewing an agency's compliance with procedural rules." *See Chocolate Mfrs. Asso. v. Block*, 755 F.2d 1098, 1103 (4th Cir. 1985) (citing *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 641 (1st Cir. 1979)).  Thus, a final rule that does not logically grow out of a proposed rule is procedurally defective under the APA.  *See Chocolate Mfrs*, 755 F.2d at 1105; *see also Roswell v. Andrus*, 631 F.2d 699, 702 n.2 (10th Cir. 1980) (if final rule "substantially departs from the terms or substance of the proposed rule" the notice is inadequate).

The relevant question in this analysis is whether reasonable parties "should have anticipated that [the] requirement" promulgated in the final rule might be adopted.  *See Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983).  For example, in *Chocolate Manufactures*, the Food and Nutrition Service (FNS) promulgated a rule that prohibited the use of flavored milk in certain federally funded programs.  The FNS, however, did not provide adequate notice that elimination of flavored milk would be considered

---

[3]  Notably, this is precisely the approach rejected by *SWANCC,* where the Court found that notwithstanding the biological importance of the SWANCC site to the ecosystems of the bird species held there, it did not have a "significant nexus" to interstate navigable waters under the CWA.  *SWANCC*, 531 U.S. at 167-74.

in the rulemaking procedure. *Id.* at 1100. The FNS gave notice of its concern over "sugar content" generally and argued that this was sufficient to put commentators on notice of the final decision. *Id.* at 1102. The Fourth Circuit vacated the rule holding that "it cannot be said that the ultimate changes in the proposed rule were in character with the original scheme or a logical outgrowth of the notice." *Id.* at 1107.

Substantively, a final rule will be "set aside" if that rule is arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). To this end, an agency must "explain its course of inquiry, its analysis, and its reasoning and show a rational connection between its decision-making process and its ultimate decision." *Manufactured Hous.*, 467 F.3d at 399; *Reynolds Metal Co. v. United States EPA*, 760 F.2d 549, 559 (4th Cir. 1985) (although deferential the Agency "must fully explicate the course of inquiry, its analysis, and its reasoning"). In performing this review, the court best acts "as a check on agency decision making by scrutinizing process and by determining whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment." *Kennecott v. United States EPA*, 780 F.2d 445, 449 (4th Cir. 1985) (internal quotations omitted).

The final rule's flaws sound in both procedure and substance. The final rule cannot withstand procedural scrutiny because the Agencies dramatically changed course from the proposed rule without providing notice to the public to allow for comment. As to substance, the final rule is arbitrary and capricious in numerous respects. Thus, Murray is likely to succeed on the merits because Agencies failed to comply with the APA.

a. *The Final Rule Is Not A Logical Outgrowth Of The Proposed Rule*

Under the APA, an agency must provide a "[g]eneral notice of proposed rulemaking" and provide "interested persons an opportunity to participate in the rulemaking." 5 U.S.C. §§ 553(b)-

(c).   The final rule adopted an entirely different course than the proposed rule.   Most significantly, the imposition of arbitrary distance and temporal demarcations marked a substantial change to the final rule that were not a "logical outgrowth" of the proposed rule. Namely, the final rule substantially changed the category of "adjacent waters" from the proposed rule by including arbitrary distances in the definition of "neighboring."   33 C.F.R. § 328.3(c)(2).[4] Likewise, the final rule made substantial changes to the case-by-case analysis, by again, adding arbitrary distances as a key feature.[5]

The Agencies "nowhere even hinted" that they were considering imposing *per se* federal jurisdiction on waters based solely on arbitrary distances.   *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009).   Absent clairvoyance, there is no way that interested parties "should have anticipated" that arbitrary distance and temporal limits would be a key feature of the rule and thus file "comments on the subject during the notice-and-comment period."   *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004); *see also Cat Run Coal Co.*, 932 F. Supp. at 778 (finding rule invalid under APA where "[f]ar from apprising interested parties of the significant subjects and issues involved," the agencies "neglected to provide enough detail to alert some parties . . . that they should be interested parties at all"). Because the final rule "substantially departed from the terms or substance of the proposed rule"

---

[4] With regard to adjacency, the only indication that the Agencies gave that they were considering a distance-based approach was the request for comments in "support for or against placing geographic limits on what waters outside the floodplain or riparian zone are jurisdictional," and "distance limitations based on ratios compared to the bank-to bank width of the water to which it was adjacent." 79 Fed. Reg. at 22,208-09.

[5] With regard to the case-by-case analysis, the proposed rule stated in conclusory fashion that the Agencies would assert federal jurisdiction over any water that in the Agencies' judgment had a "significant nexus" to a primary water.  79 Fed. Reg. at 22,269.  However, there was no suggestion that the Agencies were considering a distance-based limitation, and the conclusory fashion in which the case-by-case analysis was set forth under the proposed rule is insufficient under the APA. *Cat Run Coal Co. v. Babbitt*, 932 F. Supp. 772, 779 (S.D.W. Va. 1996) ("Conclusory statements will not suffice under" the APA).

the public had "insufficient notice" that the final rule would create federal jurisdiction based on a regime of arbitrary *per se* distances.  *See Chocolate Mfrs*, 755 F.2d at 1105, 1107.  Murray was thus deprived of notice and an opportunity to comment on substantive changes to the proposed rule.  Therefore, the final rule is invalid and will likely be set aside for procedural inadequacy under the APA.  *See* 5 U.S.C. § 706(2).

> b.  <u>*The Final Rule Is Arbitrary and Capricious*</u>

The Agencies' only explanation of their distance-based approach is that the various distances are (1) "reasonable and practical boundar[ies]," (2) consistent with unspecified "experience" and (3) and supported by a study of scientific literature finalized *after* the comment period.  80 Fed. Reg. at 37,085-91; *see also* EPA, Connectively of Streams & Wetlands to Downstream Waters (January 2015).   Yet, the Agencies provide no reasoned support for the specific distance (i.e. 1,500 feet) and temporal (i.e. 100-year floodplain) based approaches adopted.  This lacking is unsurprising considering the fact that the Agencies' own experts flatly rejected a distance-based approach.  *See* 80 Fed. Reg. at 37,064 (EPA Advisory Board concluding that "the available science supports defining adjacency or determination on the basis of functional relationships; rather that 'solely on the basis of geographical proximity of distance to jurisdictional waters.").  Further, and as is often the case in arbitrary decision-making, the Agencies have offered no explanation why these specific figures were adopted as opposed to some other distance or temporal standard.

Absent a rational explanation for (1) the distance/temporal approach adopted, or (2) the specific numerical figures promulgated, the Agencies rely solely on supposed administrative "expertise."   Courts, however, require that "administrative agencies articulate the criteria employed in reaching their result and are no longer content with bare administrative *ipse dixits*

based on supposed administrative expertise." *Appalachian Power Co. v. EPA*, 477 F.2d 495, 507 (4th Cir. 1973). The Agencies are afforded discretion to decide, but "[d]iscretion to decide does not include the right to act perfunctorily or arbitrarily." *Id.* (internal quotations omitted). The Agencies' decision to rely solely on unsupported assertions rather than "articulate a satisfactory explanation for its action including a rational connection between the facts found and the decision made" is symptomatic of arbitrary and capricious decision-making. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**C. The Final Rule Violates the Constitution.**

Murray is also likely to succeed on the merits because the final rule is unconstitutional. Among other constitutional defects, the final rule far surpasses Congress's authority under the Commerce Clause and violates the Tenth Amendment of the United States Constitution.

*a. The Final Rule Exceeds Congress's Authority Under the Commerce Clause.*

The CWA was enacted pursuant to Congress's authority under the Commerce Clause "to regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8. While the power to regulate commerce is broad it "has limits that the Court has ample power to enforce." *United States v. Lopez*, 514 U.S. 549, 557 (1995) (internal citations omitted); *see also SWANCC*, 531 U.S. at 173 ("[T]he grant of authority to Congress under the Commerce Clause, though broad, is not unlimited."). The final rule treks beyond those limits by regulating intrastate activity that will not have a substantial effect on interstate commerce.

Where "an administrative interpretation of a statute invokes the outer limits of Congress' power" there should be a "clear indication that Congress intended that result." *SWANCC*, 531 U.S. at 172. This expectation is based, in part, on the assumption that "Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional

authority." *Id.* at 172-73.   This concern is heightened where, as here, "the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Id.* at 173.   Twice now, the Supreme Court has made clear that "[t]he phrase 'the waters of the United States' hardly qualifies" as the clear statement "from Congress needed to authorize intrusion into such an area of traditional state authority . . . and to authorize federal action that stretches the limits of Congress's commerce power." *Rapanos,* 547 U.S. at 738 (plurality opinion); *see also SWANCC*, 531 U.S. at 174 (noting that there is "nothing approaching a clear statement from Congress that it intended ['waters of the United States'] to reach" wholly intrastate, non-navigable and intermittent waters).   Undeterred, the Agencies ostensibly seek to be reminded of this a third time.

The final rule exceeds Congress's authority under the Commerce Clause because it attempts to regulate as *per se* "waters of the United States" wholly intrastate waters that may, in fact, have no continuous or discernible flow.   Regulating activities with respect to wholly intrastate waters that have neither a continuous nor discernible flow will not *per se* have a substantial effect on interstate commerce.   Because the final rule asserts that each of these waters are *per se* "waters of the United States" without showing that the effect of these attenuated activities are substantial, the final rule exceeds Congress's authority under the Commerce Clause.

b.   *The Final Rule Violates the Tenth Amendment*

Not only does the final rule exceed Congress's power under Commerce Clause, it contravenes the Tenth Amendment to the U.S. Constitution as well.[6]   Among powers reserved to

---

[6] A non-government actor, such as Murray, can assert "injury from governmental action taken in excess of the authority federalism defines" because its "rights in this regard do not belong to a State." *Bond v. United States*, 131 S. Ct. 2355, 2363-64 (2011).   Because the Agencies' enforcement of the final rule will

the States under the Tenth Amendment is the authority to regulate land use and intrastate water resources. *See SWANCC*, 531 U.S. at 174 (recognizing the "States' traditional and primary power over land use and water use"); *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) ("Regulation of land use [is] a function traditionally performed by local governments"). Indeed, this power is specifically spelled out in the CWA, *see* 33 U.S.C. § 1251(b) (setting forth that "the primary responsibilities and rights . . . to plan the development and use . . . of land and water resources" is reserved for the States), making the final rule's overt usurpation of state sovereignty all the more glaring.

The final rule purports to command that the States relinquish to the federal government state authority over wholly intrastate waters. Plainly, the federal government's seizure of state authority over wholly intrastate water would "alter[] the federal-state framework" by permitting "federal encroachment upon" the States' "traditional and primary power over land and water use." *SWANCC*, 531 U.S. 173-74. This directive thus violates the States' sovereign rights under the Tenth Amendment to manage intrastate waters as they see fit. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (taking control of a State's lands is a violation of the State's "sovereign interest").

## II.    Murray Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Absent a voluntary stay from the Agencies or an order from this Court preventing its effectiveness, the final rule will imminently harm Murray. The harms bestowed upon Murray will be devastating and irreparable. Chief among these harms is the substantial sums of money that Murray will necessarily expend to apply for, obtain, and comply with permit conditions. *See* Compl., ¶ 32. For example, at Murray's Harvey Run II Refuse Impoundment ("Harvey Run II")

---

cause injury to Murray that "is concrete, particular, and redressable," Murray has standing to make this claim under the Tenth Amendment. *Id.*

in Marion County, there are numerous additional streams and additional ditches that will now be regulated under the CWA. *Id.* ¶ 28. The American Mountaineer Mine and Refuse Area ("AMEI") in Harrison County will likewise have numerous features now subject to CWA jurisdiction. *Id.* ¶ 30. Finally, the CWA will now apply to numerous additional ditches and features at Murray's Nolan Run Saddle Dike Extension in Harrison County. *Id.* ¶ 30.

Murray estimates that the final rule will cost $3.3 million in additional costs at AMEI, $8.8 million in additional costs at Harvey Run II, and $1.9 million in additional costs at its Nolan Run Saddle Dike Extension.   Scott Affidavit at 2-3 (Doc. 3-2). While it is axiomatic that economic loss, in and of itself, does not constitute irreparable harm, this proposition rests on the assumption that such economic losses are recoverable.  When Murray succeeds on the merits of this case, its economic losses will be unrecoverable from the Agencies due to sovereign immunity.  The economic losses Murray will incur will be substantial and will begin to accrue by the month's end.  Thus, Murray's financial losses are certain, imminent, and unrecoverable.  In this context, numerous courts have held that this type of economic harm is "irreparable *per se*." *See Odebrecht Constr. v. Sec'y, Fla. DOT*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."); *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (same); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 849, 852 (9th Cir. 2009) (same); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (same); *Temple Univ. v. White*, F.2d 201, 215 (3d Cir. 1991) (same); *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (same), *aff'd sub nom, Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).[7]

---

[7] While the Fourth Circuit has not squarely addressed this issue, district courts within the Fourth Circuit have been in agreement with the majority position.  *See e.g., N.C. Growers' Ass'n v. Solis*, 644 F. Supp.

Aggressive regulation promulgated by the Agencies in this action has put significant pressure on the coal industry in recent years.  As a corollary, Murray has been forced to make difficult decisions to account for the increased costs incurred through compliance.  In fact, over the last two years, Murray has had to lay-off 1,500 employees due, in part, to other zealous regulations promulgated by the Agencies and the current administration.  Murray fully expects that its $14 million dollar estimate of added costs associated with the final rule may lead to further lay-offs of its workforce. Scott Declaration at 2.  This is yet another harm that Murray will endure without redress if the injunction is not issued.  *See Local Union 2426, United Mine Workers v. District 29, United Mine Workers*, 864 F. Supp. 545, 549 (S.D.W. Va. 1994) ("A permanent loss of employment is certainly irreparable harm, and Plaintiffs have shown that it will occur without an injunction."); *see also Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 980 (7th Cir. 2012) (finding irreparable harm where movant would have to lay off "workers, close multiple clinics, and stop serving a significant number of its patients").

Additionally, Murray expects to become less competitive relative to its peers in the United States that have mine sites with fewer impacts from the final rule (due to less geographic features subject to regulation) and certainly less competitive with respect to its foreign competitors that they compete with for global coal expert.  Scott Declaration at 2-3.  Murray reasonably fears that if customers are lost because they become uncompetitive as a result of the final rule, those customers would not return if the rule were later overturned because those

---

2d 664, 670-71 (M.D.N.C. 2009) (noting that the Fourth Circuit has not directly addressed the issue of whether unrecoverable economic losses constitute irreparable harm, but finding that the court "is in agreement with those courts that have evaluated the issue" and found that such losses constitute irreparable harm).  *Cf O'Brien v. Appomattox Cnty.*, 71 F. App'x 176, 178  (4th Cir. 2003) (upholding district court's issuance of preliminary injunction and finding that plaintiffs' inability to recover their economic losses during the pending litigation).

customers would have built relationships with Murray's domestic and international competitors. This loss of customers represents irreparable injury. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co*., 22 F.3d 546, 552 (4th Cir.1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.).

Finally, while certain categories of Murray's financial harms will be subject to precise calculation (yet still unrecoverable with monetary damages), others will be difficult to ascertain. Specifically, a total dollar figure for the lost productivity and devaluation of Murray's holdings that will accompany the final rule will be difficult, if not impossible, to ascertain. In the Fourth Circuit, "irreparable injury is suffered when monetary damages are difficult to ascertain or inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994); *see also Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 784-85 (4th Cir. 2011). For all of these reasons, this factor militates in favor of granting injunctive relief.

### III.    The Balance Of The Hardships And The Public Interest Weigh In Favor Of Granting The Preliminary Injunction.

The public would benefit from the issuance of the preliminary injunction. The Agencies and public, on the other hand, would not suffer harm if the injunction is granted. The final rule greatly amplifies one of the nation's most sweeping environmental statutes. In addition to Murray, farmers, homeowners, and businesses will necessarily be required to devote significant time and expense to comply with the final rule during this litigation—all of which will be unrecoverable from the Agencies. This expenditure of money and human capital will ultimately be for naught once the final rule is invalidated. No public interest is served by "enforcing a [rule] that is likely constitutionally infirm." *Edmondson*, 594 F.3d at 771; *Carolina Pride, Inc. v.*

19

*McMaster*, No. 3:08-cv-04016-CMC, 2009 U.S. Dist. LEXIS 16300, at *42 (D.S.C. Feb. 17, 2009) ("The public interest favors issuance of a preliminary injunction against enforcement of a statute likely to be held unconstitutional.")

A preliminary injunction will not mandate affirmative action by the Agencies, but rather, maintain the status quo while the case is litigated. The Agencies have had nearly a decade to enact the final rule following *Rapanos*. Considering the Agencies' lethargic pace, the harm to the Agencies by delaying for judicial review is nonexistent. The Agencies have been operating under the current legal framework for the better half of a decade, and will suffer no harm by continuing until the final rule has been evaluated. *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003) ("The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits.").

The potential harm to the Agencies if the injunction is issued is thus minimal and far outweighed by the harm Murray faces if the injunction is denied. *See e.g., Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[W]e agree with the district court that a state is 'in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction[.]"); *see also Carolina Pride,* 2009 U.S. Dist. LEXIS 16300, at *42 (noting that risk of harm to defendants if enjoined from enforcing new statute pending resolution of action is minimal as it merely maintains status quo). Based on the foregoing, the final two factors of the preliminary injunction standard (i.e. the public interest and balance of harms) strongly favor Murray.

## CONCLUSION

For these reasons, Murray respectfully requests that the Court enter a preliminary injunction preventing the Agencies from enforcing the final rule.

Dated:  August 5, 2015                                     Respectfully submitted,

**MURRAY ENERGY CORPORATION**

By: /s/ John C. Lynch
                                                                   Of Counsel

John C. Lynch (WV Bar No. 6627)
Jason E. Manning (WV Bar No. 11277)
Counsel for Murray Energy Corporation
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 678-7765
Facsimile: (757) 678-1504
Email:  john.lynch@troutmansanders.com
Email:  jason.manning@troutmansanders.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 5th day of August, 2015, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to the following CM/ECF participants:


**<u>Counsel for Defendants</u>**

Martha C. Mann
U.S. Department of Justice
601 D. Street NW
Washington, DC  20004
Email: martha.mann@usdoj.gov

Erin Carter
US Attorney's Office – Wheeling
PO Box 591 Wheeling, WV 26003
Email: erin.carter@usdoj.gov


<div style="margin-left:50%">

/s/ John C. Lynch
John C. Lynch
Counsel for Murray Energy Corporation
Troutman Sanders LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 678-7765
Facsimile: (757) 678-1504
Email:  john.lynch@troutmansanders.com

</div>